```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF DELAWARE

 3                          -   -   -
    PACIFIC BIOSCIENCES OF CALIFORNIA, :
 4  INC.,                             :
          Plaintiff,                  : Civil Action No.
 5                                    :
             vs.                      : 17-275-LPS
 6  OXFORD NANOPORE TECHNOLOGIES INC., :
                                      :
 7        Defendant.                  :
    ----------------------------------:
 8  PACIFIC BIOSCIENCES OF CALIFORNIA, :
    INC.,                             :
 9        Plaintiff,                  : Civil Action No.
                                      :
10           vs.                      : 17-1353-LPS
                                      :
11  OXFORD NANOPORE TECHNOLOGIES INC., :
                                      :
12        Defendant.                  :

13                          -   -   -
                        Wilmington, Delaware
14                  Wednesday, August 14, 2019
                        Telephonic Conference
15                          -   -   -

16  BEFORE:  HONORABLE JENNIFER HALL

17  APPEARANCES:
                FARNAN, LLP
18              BY:  BRIAN E. FARNAN, ESQ.

19              And

20              WEIL GOTSHAL & MANGES, LLP
                BY:  EDWARD R. REINES, ESQ., and
21              DEREK C. WALTER, ESQ.
                (Redwood Shores, California)

22

23                             Counsel for Plaintiff

24
                               Gail Inghram Verbano
25                             BA, CSR, RDR, CRR
```

```
 1    APPEARANCES:  (Continued)

 2            MORRIS NICHOLS ARSHT & TUNNELL, LLP
              BY:  JENNIFER YING, ESQ.
 3
                And
 4

 5            BAKER BOTTS, LLP
              BY:  ELIZABETH DURHAM FLANNERY, ESQ.
 6                 (Houston, Texas)
              And
 7
              BAKER BOTTS, LLP
 8            BY:  STEPHEN M. HASH, ESQ.
                   (Austin, Texas)
 9

10                                Counsel for Defendant

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                           - oOo -

2                     P R O C E E D I N G S

3              (REPORTER'S NOTE:  The following telephone

4      conference was held in chambers, beginning at 11:30 a.m.)

5              THE COURT:  Good morning, counsel.  This is

6       Jennifer Hall.

7              Before we begin, let me say a few things for

8      the record.  We are here for a teleconference in the matter

9      of Pacific Biosciences of California, Incorporated, versus

10     Oxford Nanopore Tech, Inc.  There are two civil action

11     numbers, 17-275 and 17-13553.

12             And it's my understanding that we're here for a

13     call today regarding one discovery dispute that has been

14     raised by plaintiff and two discovery disputes that have

15     been raised by defendant.

16             I want to alert the parties that we are on the

17     record today.  I have with me Court Reporter Gail Verbano,

18     who will be taking down our call this morning.  And so we

19     can have a clear record and because I'm not yet familiar

20     with everyone's voices on the call today, I would like to

21     ask counsel to identify themselves each time they speak.

22             Next I'd like to ask counsel for the parties to

23     identify themselves for the record.  We'll start with

24     plaintiff's side and begin with Delaware counsel.

25             MR. FARNAN:  This is Brian Farnan on behalf of

1    the plaintiffs.  And with me is Edward Reines and Derek

2    Walter from Weil, Gotshal & Manges.

3                THE COURT:  Good morning.  And for the

4    defendant?

5                MS. YING:  Good morning, Your Honor.  This is

6    Jennifer Ying from Morris, Nichols, Arsht & Tunnell on

7    behalf of the defendants.  With me online this morning is

8    Steve Hash, Elizabeth Flannery and Jeff Gritton, all from

9    Baker Botts.

10                THE COURT:  Good morning.

11                So let's start with plaintiff's request first.

12    As I understand it, this is a request to depose two of

13    defendant's employees.

14                Who will be speaking on behalf of the plaintiff

15    today?

16                MR. FARNAN:  Your Honor, Ed Reines from Weil

17    Gotshal will be speaking on behalf of Pacific Biosciences

18    for this issue.

19                THE COURT:  Mr. Reines, let me ask you first a

20    couple of questions, and then I'll give you time to add

21    anything else that you'd like to add.

22                I want to ask you first about Mr. Sanghera,

23    defendant's CEO.  What topics do you anticipate asking

24    Mr. Sanghera about?  Topics just relevant to the issue of

25    willfulness or something else?

1          MR. REINES:  It would relate to willfulness,

2     inducement, anything where the state of mind is relevant.

3     So that -- those are the general topics.  I don't think we

4     will get into the technical nitty-gritty with him.

5          THE COURT:  And it's my understanding that

6     wilfulness is not yet part of the case and that there's a

7     pending motion to amend; is that correct?

8          MR. REINES:  That's correct.  But of course

9     inducement is in the case.  So the state of mind and

10    awareness of the patents is obviously squarely front and

11    center in the case.

12         THE COURT:  How much time do you think that you

13    would need with Mr. Sanghera to question him about those

14    topics?

15         MR. REINES:  I have no interest taking undue

16    time with witnesses, and never have.  And we're well below

17    our -- the parties agreed to 130-hour limit.  We're well

18    south of that.

19         But I think certainly within three hours.  I

20    would shoot for two hours.  I think it would be

21    artificial -- if we're flying to England, I hate to have an

22    uncooperative witness and have a problem.  But if we

23    subject-matter-limit it, I think three hours, I think,

24    realistically.  Probably be done with less than two.

25         THE COURT:  And I understand that defendant's

1   position is that if Mr. Sanghera is asked questions about

2   his decisions to put or keep products on the market or

3   presumably questions about inducement, that Mr. Sanghera

4   intends to testify that he relied on the advice of counsel,

5   and defendants say that they offered to give you a

6   declaration that says that.  Why is that not good enough?

7        MR. REINES:  First of all, the declaration is,

8   we never got the draft of the declaration.  We were open to

9   something like that potentially.  But the problem with that

10  always was, you know, somebody emailed correspondence

11  involving him.  And I don't know if you -- sounds like you

12  know the issues and record masterfully.  And, again, this

13  is Ed Reines.

14       But the -- just as an example, there's an email

15  where he's commenting on the PacBio patent in the subject

16  line, and his statement is patent claims and concepts are

17  pointless, never stand up in court, not enabled, et cetera,

18  et cetera, et cetera.

19       So a sterile comment that he's relying on

20  advice of counsel I don't think would be adequate.

21       Beyond that, in my experience in the trial

22  setting is that, you know, what is said around the topic of

23  what the reliance is and how -- you know, when it was

24  acquired and all that, it's not just a binary yes/no and

25  then you check a box and move on.  There's witness testimony

1  on the topic routinely surrounding it at trial.

2           So the -- the -- the real point here is Mike

3  Wilcox, who is CEO of the US sub, you know, it's clear that

4  Gordon Sanghera made the go/no-go decision, you know, so

5  that's where the finger got pointed.  And the parent company

6  obviously wants to show whose company is in those shoes, and

7  having him sit for deposition hardly seems like an unfair

8  thing, considering the nature of the suit and the case law.

9           THE COURT:  So just shifting gears a little

10  bit, I understand that fact discovery is closed now.  How

11  are these depositions going to impact the schedule if at

12  all in terms of keeping the remaining deadlines in the

13  case?

14           MR. REINES:  If we do them promptly, I don't

15  see any problem whatsoever.  We're -- we're -- expert

16  discovery is partially underway.  But certainly testimony

17  regarding, save mine if we're talking about Mr. Sanghera,

18  is not -- you know, is not going to move the needle on the

19  technical reports or damages reports or things like that.

20  So I don't see any effect on the schedule whatsoever.

21           And the timing is a product of -- I mean, we

22  still have the deposition a month before the discovery

23  close, and these witnesses were in our initial disclosure.

24  So, you know, I think by any measure of my experience in

25  this kind of litigation that's -- that's -- they asked us to

1    await the 30(b)(6) deposition to see how that went, and of

2    course we did that.  I don't think we should be penalized

3    for that.

4                THE COURT:  Let me ask you this:  I note that

5    the parties yesterday filed another motion for a

6    teleconference to resolve disputes regarding 30(b)(6)

7    witnesses.  If the Court orders one or both of the

8    depositions that you're requesting today, will that obviate

9    the need for the Court to address that other dispute, from

10   your perspective?

11               MR. REINES:  Excellent question, Your Honor.

12   This again, Ed Reines.  I think it might for the following

13   reason.  I'm going to get realpolitik here.

14               You asked -- you're asking such good questions.

15   I kind of want to field your questions rather than just go

16   into argument.

17               But what I think is happening or what I -- I'm

18   close to saying that I know is happening is Clive Brown is

19   their CEO.  He runs the show there on technology.  He knows

20   the technology in and out.  He's their public face.  He's

21   the internal decision-maker.  I don't mean to be disparaging

22   or anything, but it's absurd that there's a fight about

23   whether this individual be deposed.

24               What I think it is is that Stewart Reed was

25   stubbornly nonresponsive throughout his deposition in what I

1  thought was a defensive way.  And I think that the

2  perspective is that Dr. Reed is a much more controllable

3  witness that stays on message and they don't -- and I guess

4  they don't know that Clive Brown will.

5            So why I say that in response to your question

6  is -- I think having gone through it and having taken the

7  deposition of Reed myself and so forth, and having watched

8  Clive Brown's videos and all the stuff that we rely on for

9  our case, the reason I say this is because I think that he

10  can be responsive in the areas where Reed couldn't.

11            Reed -- not to get too far into it, but I think

12  it is helpful.  There's two groups:  There's a research

13  group and a development group.  Reed is in the development

14  group.  He didn't know what was going on in the research

15  group.  And some of the more technical questions regarding

16  the entomology and so forth requires the research-group

17  knowledge.  And he conceded that he couldn't answer some of

18  those questions, nor would it be fair for him to be expected

19  to because he's not in that.  Clive Brown oversees both

20  groups.

21            So I think it helps solve the other problem if

22  they designate -- they can designate who they want, but

23  Clive Brown is obviously more knowledgeable about the topics

24  than Dr. Reed was.  And so I think maybe they can use Clive

25  Brown and maybe that would resolve it.

1          That's two things, but you asked them so I

2     answered.

3          THE COURT:  Understood.  And let me ask you,

4      just since you brought up Mr. Brown, is it just -- is it --

5      I understand that part of your infringement case that you

6      want to put on to the jury is some things that he said

7      during a presentation or presentations with respect to how

8      the defendant's technology works.

9          Is it just the one presentation you needed to

10    ask him about or was he consistently talking about the

11    technology?  Are there more topics and more statements?

12          MR. REINES:  No, I mean, he's a prolific

13     speaker on Oxford Nanopore Technology and its disputes with

14     PacBio.  So it's a whirlwind of information.  It's

15     PowerPoint after PowerPoint, and it's -- the day we were

16     writing this brief, I said let's look at his Twitter

17     account, and there was a comment about PacBio from two days

18     earlier and then one from a few days before that.

19          I mean, he's constantly speaking on these

20    topics.  And to be honest -- I don't think this is a point

21    of dispute -- I think Oxford Nanopore has said he's their

22    public face of their company when it comes to speaking on

23    the technology of Oxford Nanopore.

24          THE COURT:  Is there anything more you want to

25     add before I turn to the other side on this dispute?

1          MR. REINES:  Yeah, I think I do want -- the

2      primary point I want to make -- I guess two points.

3          One point is with respect to these witnesses,

4      there's none of the declarations from these witnesses that

5      they have no personal knowledge.  And there's no declaration

6      that this is some kind of special imposition on them to

7      distract them from their duties.  This is central to their

8      business.  The lawsuit is central to their business.  They

9      know that.

10          And I think the cases that are cited, at least

11      many of them where this has ever been granted, there's

12      usually a declaration -- there's a clear, obvious situation

13      where the witness doesn't have knowledge.  They can't put

14      that in on either of these witnesses.  Just doesn't exist.

15      So that's one point.

16          The second point is, if you looked at the

17      cases -- and I'm sure Your Honor has -- you know, the

18      examples -- literally the examples that were cited in here

19      is Steve Jobs on a company that was an MPE.  And the point

20      the Court made was there's 70 MPE suits in a year against

21      Apple.  You know, the absurdity of having Jobs comment on

22      that.

23          Michael Dell was another one of the cases that

24      was relied on.  And even there I think he was a -- even

25      there a limited deposition was required.

1           And then another one is the Lupin case, was a

2     former CEO who went to Johnson & Johnson, had -- had a

3     subpoena of a third party who is now CEO of Johnson &

4     Johnson company.  None that remotely resembles this case.

5           And it's always annoying to judges when

6     attorneys invoke their long experience or whatever.  But I

7     have to say that the idea that a CTO of a very small company

8     which is constantly speaking as the spokesperson for the

9     company on technology and unquestionably a decision-maker on

10    the technology, and all products are accused infringed, the

11    idea that he isn't going to sit for a normal seven-hour

12    deposition on all the topics of which he's knowledgeable

13    really is pushing the envelope in an attempt to sort of

14    control who the witnesses are so they can have this Stewart

15    Reed.

16          And the Court is going to be interested in

17    looking at Dr. Reed's evasion when we submit, you know, on

18    that dispute.  So I think that's really the point there.

19          And on Sanghera, I agree that -- it's not a

20    product of it's -- as it's overburdensome on him.  But I

21    think the way the issues are framed up, he really -- as long

22    as he's not going to be used at trial on any witness other

23    than knowledge of the patents, I'm fine to confine him to

24    that, and I think it will be a short deposition.

25          Is there any other question?  I'm happy to

1    answer them.

2              THE COURT:  No.  I just want to clarify for the

3     record, so what I'm hearing you say is, with respect to

4     Mr. Sanghera, you're content to restrict your questioning

5     to his knowledge of the patents.  Is that what I heard?

6              MR. REINES:  As long as he's so limited at

7     trial on that same basis.  He can't be that unlimited that

8     way and then they use them as a, you know, sole-purpose

9     witness at trial.  That doesn't make any sense.

10             So if they're willing to limit him to that

11    topic at trial, then I'm willing to confine the questioning

12    to his knowledge of the patent rights.  It's really patent

13    rights, because some of his early patent applications they

14    are tracking closely are fine, for good reason.

15             THE COURT:  Okay.  Let's go and hear from the

16     other side.  Who will be speaking for the defendant?

17             MS. FLANNERY:  Liz Flannery.  I'll be speaking

18     for the defendant.

19             THE COURT:  Thank you, Ms. Flannery.  So if you

20     don't mind, I'd like to start with a couple of questions.

21     So let's start with Mr. Sanghera, since we ended on that.

22             They've made the offer that his deposition be

23    restricted, in interest of time, to three hours or less; and

24    that it also be restricted by topics so long as you agree

25    that he's not going to sit up at trial and testify about

1    broader topics.

2                  Is that acceptable to the defendant?

3                  MS. FLANNERY:  We certainly would be willing to

4     stipulate that we are not going to use him as a witness

5     about other topics.  But I don't think that we think that

6     even the three hours and limited scope of topics is

7     appropriate here for a number of reasons.

8                  As Judge Stark is going to hear about tomorrow,

9    we don't think willfulness is properly in the case.  And in

10    terms of inducement, which is what Mr. Reines pointed to,

11    part of the issue here, Your Honor, is that we have a

12    timeline that's a little bit complicated.

13                  They claim that Dr. Sanghera's knowledge is

14    relevant because he makes decisions to release products.

15    But here, Oxford was on the market with its products before

16    PacBio's patents ever issued.  This is an issue that Judge

17    Stark is going to hear about a lot tomorrow.

18                  And so in terms of what his knowledge was

19    relevant to their allegations, it's hard to nail down

20    exactly when that relevant knowledge is, because if they're

21    talking about his decision to release products, that was

22    well before their patents were ever at issue.

23                  This Exhibit C that they point to in their

24    brief, this email that they talk about, if you look at the

25    email carefully, it's talking about a patent that is not

1    involved in this case.  It was a patent that issued earlier,

2    and the email itself is from 2014.  That was long before any

3    of the patents in this case issued.

4              And so to the extent that they've suggested

5    that Dr. Sanghera might have knowledge about PacBio patents

6    relevant to Oxford products, we just don't think any of that

7    is relevant.

8              We certainly offered -- and I didn't know if

9    you had any further questions about that.  I was going to

10   talk about the declaration, but I want to make sure I

11   address your question.

12             THE COURT:  Let me ask you this.  With respect

13    to topics that are solely relevant to willfulness, your

14    point is well taken that it's not at issue in the case

15    today.  It may be tomorrow, but it's not today.

16             With respect to inducement, I understand your

17   position to be that we couldn't have induced infringement if

18   we were already on the market when the patent issued.  But

19   certainly, I imagine, plaintiffs would like to ask you about

20   your decision to continue selling the product after the

21   patent issued.

22             Why isn't that a topic that they should be able

23   to ask Mr. Sanghera about?

24             MS. FLANNERY:  Well, and that information is

25    what we claim to be privileged.  And so that's why we

1    offered to provide the declaration of Dr. Sanghera to say

2    that any information after the issuance of the patents,

3    which I think the earliest is about two months before the

4    patent suit was filed, would be protected by privilege, and

5    that's the kind of subject matter that we can put into a

6    declaration.

7         THE COURT:  Did you have anything else you

8    wanted to say about Mr. Sanghera or can I switch to

9    questions about Mr. Brown?

10        MS. FLANNERY:  Just a couple of things, Your

11   Honor.  I think, you know, the comment about, you know, we

12   haven't put in an affidavit yet -- I think this is related

13   to where we just ended -- part of that issue is because of

14   this timing.  We wanted to make sure that we got the

15   wording of the affidavit appropriate, and that's why we

16   offered to talk about that before bringing this issue to

17   court.

18        We were still talking about it when they

19   decided to bring this issue.  We're still willing to talk

20   about a declaration because of that time frame and because,

21   as your question kind of articulates, you sort of have to

22   narrow where you're looking at to a specific set of

23   circumstances and a particular set of decisions about

24   keeping the products on the market versus releasing them.

25        We wanted to work with PacBio to get that

1    language right.  We're still willing to do that, and that's

2    the only reason we haven't provided it in our briefing yet.

3              The other point about Dr. Sanghera relating to

4    the size of the company, you know, Mr. Reines pointed to the

5    fact that we've only relied on cases that deal with these

6    large conglomerates -- Steve Jobs, very well-known CEOs and

7    very large companies.

8              But there's nothing in the case law suggesting

9    that small companies aren't able to take advantage of Apex

10   protection as well.  In fact, Judge Stark rejected such an

11   argument in the Cadence Pharmaceuticals case.  We cited the

12   transcript in Exhibit T to our letter brief.

13             On Page 13 of that transcript, Judge Stark

14   specifically said that even a small company is entitled to

15   that.  And, in fact, PacBio has suggested -- and they're

16   about the same company -- about the same size in terms of

17   number of employees -- they suggested that their own CEO,

18   Michael Hunkapiller, shouldn't have full discovery in this

19   email because he's a very high-up executive and has

20   knowledge about sensitive issues in the case.

21             So this notion that somehow Oxford's CEO is not

22   entitled to Apex protection because it's only a small

23   company is just not supported by the law.  So that would be

24   the only other comment I'd have to Dr. Sanghera.

25             THE COURT:  So let's switch to Dr. Brown.

1    Plaintiffs have made the point that they ought to be able

2    to depose him because he is the person who is actually

3    making comments and giving presentations about the

4    technology, and they apparently intend to rely on some of

5    those comments and presentations as part of their

6    infringement case.

7              So I take your point that other employees have

8    testified about the technology in prior depositions, but

9    they are not the ones who gave the presentations.  So it

10   doesn't really seem to me to be duplicative.  What is your

11   response to that?

12             MS. FLANNERY:  Well, the fact that Mr. Brown

13   gave these presentations -- I mean, statements are what

14   they are.  They have the PowerPoint presentation.  And of

15   course the only thing that's relevant to the issue of

16   infringement or willful infringement in the case is the

17   structure and operation of the products and, of course, to

18   the extent there was a decision made relative to an issued

19   patent, that could be relevant to willfulness.

20             But what -- the basis for what -- for what

21   Mr. Brown presented why he thought what he thought, none of

22   that is really relevant to the issues of infringement or

23   willfulness or inducement or anything of that in the case.

24             I mean, as other witnesses -- they testified

25   regarding the content of that.  They've actually testified

1    that other employees at Oxford, including several of the

2    witnesses that we've offered, actually prepared the subject

3    matter of those presentations.  So they are actually -- they

4    actually have more personal, firsthand knowledge of that

5    information than Mr. Brown, even though he was simply the

6    public face.

7           And lots of cases note that simply because

8    you've made a public statement doesn't mean that the witness

9    has firsthand, unique knowledge about the subject matter,

10   for this very reason:  Because they have employees that are

11   providing them with the information; they're just providing

12   it to the public.

13          THE COURT:  And let me switch gears a little

14   bit.  The plaintiffs have said that they could take the

15   depositions of these individuals in short order.

16   Presumably that's in the next few weeks.  Would there be

17   any issues producing either one on that timetable?

18          MS. FLANNERY:  So I don't think we've actually

19   checked on their schedules.  I mean, certainly we would

20   need to do that, given their travel schedules and things

21   like that.  I don't know for sure that they'll be

22   available, but we're happy to check on their time frames

23   and get back to PacBio.

24          We've not been unable to work out appropriate

25   time frames, if that becomes necessary, in the past; and I

1    don't expect we would have a problem of doing that if the

2    Court orders it.

3              THE COURT:  And Ms. Flannery, is there anything

4    else you want to add before I turn it over to Mr. Reines

5    for a brief rebuttal?

6              MS. FLANNERY:  You know, the only other point I

7    would make about the testimony of Dr. Reed, since

8    Mr. Reines raised it -- and, again, in connection with the

9    additional letter that was filed with the Court, I expect

10   we'll be hearing more about this.

11             But at least with regard to the excerpts of

12   Dr. Reed's testimony that they cited, Dr. Reed was not

13   unresponsive or argumentative; he simply did not agree with

14   the way PacBio's counsel was characterizing statements in

15   the slide.

16             He didn't say he didn't know what the basis for

17   the statements were or that he didn't know why they were

18   stated or whether they were applicable to the accused

19   products.  He simply didn't agree with characterizations.

20   And that is not an inability to testify or provide the

21   relevant information about those presentations.  It simply

22   is a disagreement with the way they were characterized by

23   counsel.

24             And that was exactly the basis in the Infinity

25   Labs case that is cited in our letter briefing as to why the

1   Court found that the other witness' testimony was made --

2   the deposition of Mr. Jobs unnecessary.  Because it wasn't

3   that they weren't able to testify about the basis for his

4   statements and presentations; they just didn't vary from

5   those statements.  And the fact that there was disagreement

6   on that wasn't a reason to go depose Mr. Jobs.  Same thing

7   here with Mr. Brown.

8                THE COURT:  Thank you.

9                Mr. Reines, let me turn it over to you for a

10  brief rebuttal.  But before you start, I wanted to ask you

11  about the phrase that the defendants use, and that's the

12  phrase "structure and operation of the accused products" as

13  a topic that Mr. Brown -- Mr. Brown's deposition could be

14  limited to.  Is that sufficient?

15               MR. REINES:  No.  He had knowledge of the

16   patents.  He was tracking them.  He's basically the central

17   character in this case.  And so I don't think any

18   limitation -- I think just rewarding someone for

19   withholding a CTO under these circumstances, under the

20   subpoena, the Apex doctrine shouldn't get you those kind of

21   constraints on the deposition.

22               He knows about the patents.  He runs the

23  company.  He runs the technical side of the company.  The

24  idea that -- that -- how the systems work underneath the

25  PowerPoint or underneath the video or underneath the Twitter

1    statements doesn't matter is disturbing.  Obviously, it --

2    it's all double-talk.  Obviously, it matters.

3             There's issues about how the -- there's complex

4    issues of enzymes and how the different polymers are read

5    that -- and he explained what he thinks the theories are,

6    and we have witnesses that are saying that it's not what he

7    said and -- you know, I mean, so . . .

8             There's relationship issues within the

9    organization, structure of the organization.  I mean,

10   just -- I don't think it would be fair to limit it that way.

11   I think an hour limit of a normal deposition for what in

12   many ways is their most important witness is what makes

13   sense under these circumstances.

14             THE COURT:  Is there anything else you wanted

15    to state in response to what you heard from the other side?

16             MR. REINES:  Yeah, let me be brief.  I know

17    you've got a busy docket.

18             On Sanghera I think it is not so simplistic.

19   This isn't a one-patent case involving DNA MPEs or something

20   like that.

21             They've been monitoring our patent portfolio.

22   They have electronic tabs on it.  It's been a subject of

23   discussion at their management level.  They've been tracking

24   it since 2014.  They have -- they've introduced new products

25   this year, major new products in the last couple of years

1    that, you know, are post the patent.  And so -- you know,

2    patent applications are published.  That's how these types

3    of companies often track each other.

4              It's just not a simple thing where he says, I

5    just relied on counsel.  I don't even know what that would

6    mean.  And inducement's in the case, and the Court is well

7    aware of the law on that.  And so I think that's the

8    explanation and the most important point for Dr. Sanghera.

9              And then if you look -- I'm not going to get

10   too deep into the law on this point because I'm not sure

11   it's that important on this thing.  But what Judge Stark

12   said was that the witness -- the CEO didn't have, you know,

13   direct knowledge regarding secondary considerations relating

14   to patents use defense.  It's an edge issue that was -- this

15   is -- it's so different.

16             And then with respect to Brown, I already said

17   it, but I just think it's worth the restatement, is the idea

18   that he's describing how these products that you can't

19   view -- right?  As this Court knows, you can't view how the

20   molecules are working; you can't view how the enzymes are

21   working; you can't view how -- which ones of the polymers

22   are contributing to signals and all these things.

23             And he made very inculpatory statements

24   publicly when he's describing it, and now in deposition and

25   in their expert reports, they're trying to cast it

1   completely different.  And we need a full, probing

2   deposition of Brown.  It's only fair under these

3   circumstances, Your Honor.

4                And I thank you very much for your time.

5                THE COURT:  Thank you.  I have no further

6    questions on this dispute.  Let's switch to the next

7    dispute, and this is defendants request that plaintiff be

8    ordered to answer three requests for admission.

9                Ms. Flannery, will you be speaking on behalf of

10   defendant?

11               MS. FLANNERY:  I will not.  One of my

12    colleagues --

13               MR. HASH:  No, Your Honor, this is Steve Hash.

14    I'll be addressing this issue.

15               THE COURT:  Okay.  Let me begin with a couple

16    of questions.  And I want to dig into the text of the

17    request first, if we could.

18                And just to preface it, it's not really clear

19   to me what you're asking here, so let me read the request

20   for the record.

21                It says:  "Admit that as of the claimed

22   priority date of the subject matter claimed in the patent, a

23   person of ordinary skill in the relevant art would not have

24   been able to determine the sequence of a nucleic acid by

25   translocating said nucleic acid through a nanopore as

1    described in the patent."

2              So when I read that, it's not entirely clear to

3    me what this is asking.  It's saying admit that a person of

4    ordinary skill in the art would not have been able to do

5    something as described in the patent as of the priority

6    date.  Is this a person of ordinary skill in the art that

7    has the patent in front of them?  Is this a person without

8    the benefit of the patent?

9              And I understand, after reviewing the parties'

10   briefing, that you've clarified the question in a letter to

11   the plaintiff, but you want plaintiff to put the answer down

12   in writing to the question as asked.

13             And so my question to you is:  Why aren't they

14   entitled to have you re-write that question before they put

15   their answer down?

16             MR. HASH:  I think the way that you summarized

17    the question is exactly what we're asking.  And -- and

18    Mr. -- Mr. Reines threw around a term that I think is

19    apropos in this case.  This is a nonpracticing entity case.

20             At the time of the patent that they were filed,

21   nanopore sequencing, no one could do it.  Certainly,

22   PacBio could not, have not and cannot sequence by nanopore

23   sequencing.  Nanopore sequencing was not a viable technology

24   until several years after this patent was filed, and that is

25   simply the meat and bones of what we're asking for here.

1          Just a clarification that, as of the filing

2    date in this patent, persons of ordinary skill in the art

3    could not sequence a nucleic acid by translocating it

4    through a nanopore.  As that is -- not necessarily as it's

5    described, but that is the subject matter that they are

6    talking about here:  Sequencing a nucleic acid molecule by

7    translocating it through a nanopore; right?

8          If I asked the question, in May of -- in

9    April/May of 2009, could you sequence a nucleic acid

10   molecule, the answer to that would be:  That's a fact; of

11   course.

12         Standard, you know, sequencing technology back

13   in the 1970s and template-dependent sequencing processes

14   that evolved over that -- that 30-year period, and it was --

15   retained the sequence.

16         The question here is, as of 2009, could you

17   likewise determine the actual bases AGCT of a nucleic acid

18   molecule by translocating that molecule from a nanopore?

19         They couldn't do it, and the fact is that no

20   one could.  And that's simply the issue that -- the fact

21   that we are seeking and the issue that they should be

22   required to respond to.

23         THE COURT:  So you suggested that you need them

24    to clarify what their position is.  I don't have the

25    benefit of the expert reports.  I don't know what their

1    contentions are, but presumably they dispute your argument

2    that the patent is not enabled.

3              Why do you need them to clarify this?  Do you

4    not know what their position is on enablement?

5              MR. HASH:  We're not asking the ultimate issue

6    of enablement.  The request for admission is not is the --

7    are the claims of this patent enabled.  The questions go to

8    the fact as to whether the underlying method that these

9    claims are directed to was viable at the time.  Could a

10   person of ordinary skill have actually sequenced a DNA

11   molecule by translocating it through a nanopore in 2009,

12   and the answer is no.

13             Now, they haven't -- we don't know if they

14   dispute that or not because they won't answer the question.

15   But they certainly can't point to any facts, any literature,

16   that shows in this time frame that persons of skill were

17   able to take a nucleic acid molecule of unknown sequence,

18   thread it into a nanopore, run a current across that

19   nanopore and determine a sequence of what that molecule was.

20             But that -- that activity, that method, that

21   determination is all questions of fact, not of law.  And

22   while that evidence certainly goes to the issue of

23   enablement, those facts -- that evidence goes to the issue

24   of enablement.  Could a person of ordinary skill do it at

25   the time, that is not the legal question that's being asked.

1          THE COURT:  So let me ask it a different way.

2     So I looked at the materials provided by the parties, and

3     various courts have come up with rules for requests for

4     admission:  Rules about asking about facts versus law;

5     rules about asking about single facts versus multiple

6     facts; rules about whether a request for admission is

7     ambiguous or vague.

8               But isn't what all of the courts are really

9     saying is that you look at the request for admission and you

10    see if answer to it will settle uncontested issues and

11    simplify the trial.  And I'm struggling with how them

12    answering this RFA settles uncontested issues and simplifies

13    the trial.  It seems to me that it creates more ambiguity

14    and complicates the trial.  Can you respond to that?

15              MR. HASH:  I'm not sure that I understand

16    because, you know, if a person of ordinary skill at the

17    time of the filing of the application couldn't do nanopore

18    sequencing -- which is something that needs -- the jury

19    needs to understand -- if you couldn't do nanopore

20    sequencing as described and ultimately claimed in the '400

21    patent and in other literature, then -- then that is

22    something that -- a fact that the jury needs to adduce.

23              If I had a patent on cold fusion -- right? -- I

24    think we all understand that cold fusion is not a viable

25    technology.  Everybody knows the -- everybody would like to

1    do cold fusion, and everybody sort of knows generally how

2    you do it.  But that doesn't mean if I filed a patent on

3    cold fusion, that that patent -- that a person of ordinary

4    skill could carry that out.

5             Similarly here, the fact that nanopore

6    sequencing was not viable at the time, nanopore sequencing

7    in terms of translocating a nucleic acid through the

8    nanopore and then measuring current variations in terms of

9    sequence -- because that technology couldn't be done, that

10   fact is very important.  It's something that the jury needs

11   to understand in assessing whether or not that -- that first

12   the PacBio inventors here possessed an invention that they

13   couldn't do, nor could anybody else, and they couldn't teach

14   how to overcome those issues.

15            THE COURT:  Is there anything else you wanted

16    to say before I turn it over to the other side?

17            MR. HASH:  No, Your Honor.  I think that's it.

18            THE COURT:  Thank you.  Let's hear from PacBio.

19            MR. WALTER:  Thank you, Your Honor.  This is

20    Derek Walter from Weil Gotshal.  I'll be addressing these

21    issues.

22            I think after hearing the oral arguments, that

23   the Court understands these issues.  A couple of points.

24            First off, there's a question of whether this

25   RFA is directed to enablement.  I think it's very clear,

1    based on the argument we just heard from Mr. Hash -- because

2    it is; I jotted down one of the things he noted at one

3    point.  He said, All this RFA is asking is if, quote, the

4    underlying method these claims are directed to was viable.

5    That's enablement.

6            And you just heard him finish his argument,

7    again, point out that all they're asking was whether someone

8    could actually carry out the claimed invention because he

9    couldn't think someone could at the time.

10           It's very clear:  This RFA is directed toward

11   the ultimate question of enablement.  That's what the RFA

12   sounds like it's directed towards.  It's not directed

13   towards any particular step in the claim.  It's directed

14   towards the overall claim as a whole and whether someone

15   could carry it out.  That's enablement.

16           And you're not allowed to do that with an RFA.

17   You're not allowed to ask someone to admit or deny

18   obviousness.  You're not allowed to ask him to admit or deny

19   something is prior art.  You can't ask him to admit or deny

20   a claim construction.  And just as you can't ask him for

21   those legal conclusions, you can't ask him to admit or deny

22   the legal conclusion of enablement.

23           Now, there's also the other point that came up,

24   which was whether these can be realistically answered in a

25   way that actually clarifies things in the manner RFAs are

1   intended to be used for, and they clearly are not.

2              RFAs are supposed to be directed to relevant

3   statements of fact.  Supposed to be simple and direct.  This

4   is not any of those things.

5              Requests for admissions should be phrased so

6   that they can be admitted or denied with minimal commentary.

7   That is the Tulip Computers case.

8              That is the exact opposite of this.  This is

9   not the kind of thing that we can admit or deny for us to

10  answer this.  We can't just say "yes" or "no" for us to

11  answer something like that.  We'd have to put in a mini

12  expert report, okay?

13             First we'd have to define the, quote, relevant

14  art, because the RFA is phrased in terms of, quote, the

15  relevant art, okay?

16             First -- and then after that we have to

17  identify what the person of ordinary skill is in the, quote,

18  relevant art, because the RFA is just phrased in terms of

19  the person of ordinary skill.  That's a complex legal

20  concept.  It's an entire prong of the Graham factors.

21             And the actual level of the person of ordinary

22  skill in the art is not defined in this RFA.  We'd have to

23  define it.  And it encompasses not just the qualifications

24  of the individual but also competency, skills in particular

25  pieces of information.

1              And then we have to make clear what we mean by

2      DNA sequencing and the level of adequacy that this

3      encompasses.

4              You know, Mr. Hash portrays this issue of

5      whether someone can sequence DNA as a simple binary yes or

6      no.  It's not necessarily that clear.

7              There's always the issue of accuracy.  What

8      level of accuracy are we talking about?  Can someone

9      sequence a piece of DNA with a particular accuracy using a

10     nanopore in 2008?  Yes, but what about if you're asking for

11     a higher level of accuracy?  That might be a different

12     answer.  And that's not going to be something that can be

13     easily answered just with a yes-or-no answer of this RFA.

14             And then we have to go through every single one

15     of the methods of embodiment that are described in the

16     patent, because the RFA presumably covers the entire patent

17     because it's phrased in terms of what's described in the

18     patent.

19             And then finally we have to go through and say

20     whether a person of ordinary skill could use that method to

21     sequence by translocating through a nanopore and describing

22     any relevant limitations to it.

23             So this isn't something that you could admit or

24     deny.  This is something where you have to actually put in

25     an expert report, okay?

1          And this is what we've told them from the

2    outset, that this is not an RFA that is amenable to a

3    straightforward admission or denial.  It's something where

4    you've got an RFA that's, No. 1, directed to the ultimate

5    legal conclusion of enablement, and that's improper; and

6    No. 2, it's not something we can possibly answer by a simple

7    admission or denial.

8          THE COURT:  Mr. Walters, can you comment on

9     Mr. Hash's statement that they don't know whether or not

10     you plan to defend their apparent argument that the patents

11     are not enabled?

12          MR. WALTER:  Yeah, I'm glad you brought that

13     up.

14          You know, there was a lot of argument from them

15    about how the patents aren't enabled because at the time, in

16    2008/2009, nanopore sequencing was impossible.  He compared

17    it to cold fusion.

18          That's very interesting to hear, because if you

19    go back and look at the papers in this case, what you'll see

20    is that, at the outset of the case, they put in a motion to

21    dismiss our patent infringement claims under Section 101.

22    And in that motion they argued pretty strongly that nanopore

23    sequencing at the time of the invention was routine,

24    conventional and well understood.  So it's a little bit

25    surprising here to see that it's impossible.

1          The fact is in the 2008/2009 time frame,

2    nanopore sequencing was a developing and emerging

3    technology, and it wasn't routine, conventional and well

4    understood.

5          But certainly the patent definitely does enable

6    the claimed invention, and we are going to rebut that.  And

7    I think it's going to be pretty hard for them to challenge

8    the notion that the claims aren't enabled based on their

9    previous assertions that nanopore sequencing was, in fact,

10   routine, conventional and well understood.

11         THE COURT:  So let me just -- actually, my

12    question was actually a lot more simple even than that,

13    which is:  Have you put them on notice that you plan to

14    defend their argument that the patent is not enabled?

15         MR. WALTER:  Absolutely.

16         THE COURT:  And what paper would that be in?

17         MR. WALTER:  I believe probably would have been

18    in an interrogatory response.  I'd have to go back and

19    look.  But I think they're well aware that we plan to

20    challenge that.  We haven't put in our rebuttal and

21    validity report yet.

22         And, you know, it's an interesting question

23   that you asked that, because I don't think enablement was a

24   very significant part of their report.  The primary part of

25   the report was prior art, but enablement was a very small

1    part of their report.

2           But I don't think there's any dispute they

3    understand we're going to challenge any part of the

4    contention that the claims aren't enabled.

5           THE COURT:  Let me now turn it back over to

6    Mr. Hash and give him an opportunity to add anything he'd

7    like to say in response to what he heard from Mr. Walters.

8           MR. HASH:  Yes, Your Honor.  I think what's

9    happening here is the language as described in the '400

10   patent as being conflated beyond what I read, or maybe

11   we're just reading it differently, but what I'm reading the

12   RFA to be about here.

13          We are -- this RFA is directed to the simple

14   issue that:  Was nanopore sequencing, the process of

15   translocating a nucleic acid through a nanopore, viable in

16   2009?  Just like -- the analyses that I drew is, would Your

17   Honor have an issue if the RFA was:  In 2009, could you

18   sequence DNA?

19          Here all we're asking is:  In 2009, could a

20   person of skill sequence DNA by passing it through a

21   nanopore?  That is what this RFA was designed to elicit.

22          The fact that -- they raised the issue about a

23   person of ordinary skill in the art.  They defined the

24   person of ordinary skill in the art multiple times.  So they

25   can't sit there and say, We don't know what a person of

1    ordinary skill in the art is when they defined it.  They're

2    just talking out of both sides of their mouth.  They defined

3    it multiple times, what a person of ordinary skill in the

4    art is, and now they say, We don't know.

5            What it describes in the patent is a process of

6    translocating a DNA molecule through a nanopore and

7    obtaining sequence from that.  The issue is:  That wasn't

8    viable until later.

9            And if they agree with that, then they should

10   agree with the request.  If they believe that nanopore

11   sequencing was viable, they can just deny the request.

12           Now, Mr. Walter made a big issue about the 101

13   motion that we filed, and that is a mischaracterization of

14   the argument that we made there, and it is very akin to the

15   cold fusion argument.

16           The argument that we made was:  The components

17   that were claimed were all routine and well understood in

18   2009.  The basic components of nanopore sequencing has been

19   around since the 1990s.  The fact was like cold fusion:

20   Everybody knows the machinery that -- the basic machinery

21   that you would use to do cold fusion.  They just never got

22   it to work.

23           Similarly here, everybody knew the basic

24   components that were required for nanopore sequencing.  It

25   just didn't work until 2011 or 2012.

1          So what we were arguing was routine in 2009 was

2    the components that they were reciting in the claim, not

3    nanopore sequencing.  And here, the fact as to whether or

4    not somebody could have carried out nanopore sequencing in

5    2009 is a fact.

6          It's not -- it's not the core issue of

7    enablement.  The core issue of enablement is:  Could

8    nanopore sequencing be used as claimed?  Here we're just

9    asking:  Could you do nanopore sequencing at all?

10          THE COURT:  I understand your argument.

11          Let's move on to the third argument, which is

12    defendant's request to prohibit PacBio from disclosing

13    certain confidential information to its consulting expert,

14    Dr. Fair.

15          Let's hear from ONT first.  Who will be

16    speaking?

17          MR. GRITTON:  This is Jeff Gritton.  I'll be

18     talking on this issue.

19          THE COURT:  Mr. Gritton, what is the standard

20     under which I should determine whether it's appropriate to

21     allow Dr. Fair to have access to the information?

22          MR. GRITTON:  I think at the core is a

23     balancing of kind of the interest of both parties, you

24     know, and the needs of PacBio to have this particular

25     expert versus the interests of ONT in protecting the

1    confidentiality of this technical information.

2         I think the case that's probably closest to

3    this one is the Gillette versus Dollar Shave Club case we

4    cited in our report.  That also dealt with the potential

5    expert that was previously associated with the competitor

6    and in the center on pending applications that were assigned

7    to that competitor.  And in that case, the Court found --

8    those concerned and found that it wasn't appropriate to

9    disclose the confidential information to that particular

10   expert.

11        THE COURT:  So Dr. Fair has now submitted a

12   declaration outlining his current limited involvement with

13   ALL.  And I understand that that sort of came late in the

14   day with respect to this dispute percolating up to the

15   Court.  But in view of that declaration that has now been

16   submitted, why isn't that good enough?

17        MR. GRITTON:  I think one of the big issues is

18   he's filed applications that he's an inventor on that are

19   assigned to ALL, and now Illumina; and those are being

20   prosecuted.  It's certainly plausible and -- that he'll be

21   asked to assist with the prosecution on those applications.

22   And the big issue as we've asserted is it's quite likely

23   that he'll be called to testify regarding those patents.  I

24   think even if he's no longer involved in the way he has

25   been in the past, it doesn't mean that he wouldn't be

1    involved in the future.

2              THE COURT:  So they've offered to carve out

3    information regarding a particular product, which I presume

4    is one that's currently in development.  Does that allay

5    your concerns?  Or are you worried about information about

6    products that are currently on the market being disclosed

7    to Dr. Fair?

8              MR. GRITTON:  The product we mentioned,

9    VolTRAX, is currently on the market.  There are other

10   products that are currently in development that use similar

11   technology, so the issue is not just related to VolTRAX.

12             And I think another kind of complication for

13   us, at least, is that we have no idea what information I

14   think Dr. Fair needs or why they think his testimony is

15   necessary in this case.  It's tough for us to understand

16   that particular carve-out without knowing what information

17   they think he needs.

18             THE COURT:  Let me turn it over to the other

19   side here -- and Mr. Gritton, I'll give you a chance to

20   respond.

21             For PacBio, who will be speaking?  And can you

22   give us an idea of what information you intend to disclose

23   to Dr. Fair?  Certainly it isn't the whole document

24   production.

25             MR. WALTER:  Yes, this is Derek Walter.

1          So the VolTRAX product, to put things in

2     context, is a product that's used to prepare DNA for

3     sequencing.

4          We don't need Mr. Fair to see information about

5     that particular product.  Mr. Fair is an electrical engineer

6     by trade who has done work related to DNA sequencing.  And

7     we want him to opine not on the process of how you prepare

8     the DNA for sequencing, but what happens when you actually

9     do the DNA sequencing, and what some of that signal

10    information looks like, and some of the signal-to-noise

11    properties of the signals that are arise from the nanopores,

12    and Oxford nanopore's sequencing products, and the

13    resolution of those products, and their ability to resolve

14    signals from particular groups of basals.

15         That's what we want him to look at.  And so we

16    don't really have any interest whatsoever in showing him

17    information about the VolTRAX, which has nothing to do with

18    those issues.  And that really is the only concern they've

19    raised with any type of particularity, is that there's this

20    VolTRAX issue.  That's not an issue for Mr. Fair.

21              THE COURT:  So the other side is worried about

22     inadvertent disclosure.  Is there anything that you can

23     stipulate to or any topic that you could outline for us on

24     the call today with respect to what information will be

25     provided to Mr. Fair to allay their concerns?

1          MR. WALTER:  Well, I think that's what I --

2     that's the information I just provided:  Information

3     regarding the nature of the electrical signals that comes

4     out of their nanopore sequencing instrument, the noise

5     properties of those signals and the resolution properties

6     of those signals.  It's not the information about how you

7     prepared DNA for sequencing using the VolTRAX.  That's the

8     basic overview of the information we want to provide.

9          Now, this whole issue of inadvertent

10    disclosure, it seems like a -- we just don't understand it.

11    Because, frankly, you know, the concerns they've raised are

12    concerns that could arise in the context of any expert, that

13    the expert could inadvertently disclose things to someone.

14         Now, was the Court asking us about us

15    inadvertently disclosing things to Dr. Fair?  Is that what

16    the question was about?

17         THE COURT:  No, no.  I just -- you know, so it

18    sounds like what I'm hearing you say is that you want to

19    give him information about the structure and operation of

20    the accused products.  Is that fair?

21         MR. WALTER:  Yeah.  It's really one particular

22    aspect of the accused product.  The easiest way to

23    understand this is that the VolTRAX product, the one that

24    they're concerned about, the one that ONT is concerned

25    about, the one that they've raised as an issue is a product

1    that is concerned with what happens before you do the

2    sequencing and how you prepare a sample of DNA for

3    sequencing.

4         And what we want to have Mr. Fair look at is

5    something that happens after that process, something that

6    happens when you actually do the sequencing and the signals

7    and the information that comes out of the sequencer.  That's

8    the way to understand it.

9         THE COURT:  Is there anything else you wanted

10   to say before I turn it over to the other side?

11        MR. WALTER:  Yeah, I think it's worth noting

12   that this concern really is, I think, very odd.

13        There's no reason to think Dr. Fair is going to

14   violate the protective order here and misuse information for

15   some improper purpose.  He's been an expert on many cases

16   before.  He knows what's involved, and there's no allegation

17   that he's misused information in the past.

18        All of their concern is based on this company

19   called ALL, which is owned by Illumina, and Illumina is the

20   party that's apparently sued them in the past, and Illumina

21   is just a parent of ALL.

22        ALL has never actually sued him.  And

23   Dr. Fair's involvement with this company ALL is so minimal.

24   He's put in a declaration to that effect.  It's a company

25   where he's only spoken with them once.  He's on the

1   scientific advisory board, and that was only until 2013.

2   His role with them ended in 2013, so he hasn't been involved

3   with them in six years.  He's never had any role in the

4   management or operation of this company.

5           And so this concern that he would get some

6   information about a product, where we agreed we don't need

7   to give him the information about that product -- that he'd

8   get information about this product and then run over to this

9   company he hasn't been involved with and has -- he's only

10  ever have had a very limited relationship with and disclose

11  it to them so they can then misuse it and either prosecute

12  patents or do something else, it just seems very

13  unreasonable.  And I think that big-picture understanding of

14  what the situation is worth -- is really important to have

15  in mind.

16          THE COURT:  Thank you, Mr. Walter.

17          Mr. Gritton, is there anything you heard that

18  you'd like to respond to?

19          MR. GRITTON:  Yeah, just a couple of points.

20          I think first is kind of -- kind of dismissing

21  our concerns.  I think the current lawsuit is the latest in

22  a series of lawsuits that Oxford has been defending over the

23  last several years, both by Illumina and PacBio, and

24  Illumina as well as other courts because it's currently in

25  the process of acquiring PacBio.  So from Oxford's

1   perspective, it's not farfetched to be concerned about

2   future litigation between some of these parties.

3           With regard to the -- I don't think the concern

4   here is -- we're not maligning Dr. Fair's intent, but the

5   real risk is inadvertent disclosure.  He is indisputably an

6   inventor on patents that are assigned to ALL and Illumina,

7   and those patents are being prosecuted.

8           But there is a protective order in this case,

9   but the protective order does not have a prosecution bar

10  that applies to Dr. Fair.  There's nothing stopping him from

11  participating in prosecution of those patents.  So there's

12  still a live concern, even if he's not currently actively

13  involved in those cases.

14          And then the last point I wanted to raise is

15  PacBio, in their letter briefs filed in this case -- it's

16  BioLab labs, where a Court did allow the expert to see some

17  material.  And I think the distinction there is kind of

18  important here.

19          In that case, the party that was deposing the

20  expert had limited their request to three very specific

21  items they wanted to show the expert.  And I think that

22  might be a different situation than here, where there's --

23  that's a lot more vague.  We don't know what particular

24  materials they want to show him other than that little bit

25  of information we got today.  And we have kind of a vague

1    carve-out regarding VolTRAX, but then there's other products

2    still in development.

3              So I think there's a lot that's open-ended

4    about this that wasn't open-ended in the BioLabs case that

5    does give us concern.

6              THE COURT:  Well, I'm hearing them say they

7    only want to give Dr. Fair information about accused

8    products.  Would that satisfy your worries?

9              MR. GRITTON:  I think the issue that Mr. Walter

10   raised about noise issues, I think that's a pretty common

11   technical issue in electric engineering.  It seems like

12   there's a lot of experts that could address that issue, and

13   it's not clear to us why they need Dr. Fair, who does have

14   these connections to parties that are concerning to us,

15   needs to be that particular expert, and he needs to address

16   it here.

17             And I think in the case, it's notable that the

18   infringement reports have already been served.  They have

19   expert reports from three different experts on infringement.

20   They're all looking at Oxford's product, and it's not clear

21   why this additional testimony is needed.

22             THE COURT:  Thank you.

23             Counsel, we are going to end the oral argument

24   now.  I will take all three of these disputes under

25   advisement.  What I anticipate doing is issuing a text order

1    either later today or tomorrow with my rulings.  It will be

2    a short text order and the rulings will appear on the

3    docket.

4               I will say, though, for the record now that

5    neither party has requested payment of fees and costs under

6    Rule 37, and in any event, based on what I've heard today, I

7    find that fees and costs are not appropriate for any of the

8    disputes raised.

9               You can look forward to my ruling today or

10   tomorrow.  And I thank all of you, and have a great day.

11              (Telephonic conference ends at 12:29 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2          I hereby certify the foregoing is a true and

3   accurate transcript from my stenographic notes in the

4   proceeding.

5

6

7   *Gail Inghram Verbano* 

8   _____
    Gail Inghram Verbano,
    BA, CSR, RDR, CRR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25